M. H. Marr v. Commissioner. Adam Marr v. Commissioner.
Marr v. Commissioner
Docket Nos. 105865, 105866.
United States Tax Court
1942 Tax Ct. Memo LEXIS 57; 1 T.C.M. (CCH) 178; T.C.M. (RIA) 42644; December 7, 1942
*57 George S. Atkinson, Esq., Dallas Nat'l Bank Bldg., for the petitioners. Donald P. Meyers, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, J.: These consolidated proceedings challenge respondent's determination of income tax deficiencies for each petitioner in the amounts of $792.19 for the year 1935, and $16,997.93 and $16,997.92, respectively, for the year 1936. The parties have agreed on the basis of stipulated facts that there is a deficiency in income tax due from each petitioner in the amount of $1,961 for the year 1936 and have so stipulated. The 1935 tax remains in controversy here and turns on whether petitioners realized taxable income on a transaction involving an oil payment. Findings of Fact The petitioners, who are husband and wife, reside at Dallas, Texas, and for the years in question filed individual Federal income tax returns with the collector of internal revenue at Dallas on a community property basis. In 1935 petitioners owned in community an undivided one-third interest in the Hunter oil and gas lease located in the Podessa Field, Caddo Parish, Louisiana, which was a new field but known to be productive of gas. The balance of *58 the undivided interest in the Hunter lease was owned one-third by D. L. Perkins, one-sixth by John A. Thompson and one-sixth by R. A. Bristol. Petitioners and their co-owners desired to have an oil well drilled on the lease and one driller offered to complete a well in exchange for a $100,000 oil payment. Petitioners, not being confident of oil discovery, desired to accept this oil payment arrangement but their co-owners having greater confidence in the property and believing they could drill a well substantially less if a cash payment for drilling were made would not accept the offer. Thereafter, petitioners' co-owners obtained an offer to drill for a cash payment of approximately $58,000. Accordingly, a mutually agreeable arrangement was evolved whereby the petitioners assigned to their co-owners a $33,333.33 oil payment, that is, their one-third pro rata share if the entire drilling had been done in exchange of a $100,000 oil payment, and the co-owners agreed to furnish petitioners' pro rata share of cash, that is, $19,333.33, in addition to their own shares, in order to raise the $58,000 necessary for the cash drilling contract. The two instruments effecting this arrangement *59 were excuted on November 2, 1935. The first document executed by petitioner M. H. Marr and known as the "Oil Payment Agreement" provided in substance as follows: Whereas, the undersigned M. H. Marr owns a one-third interest * * * [in the oil and gas lease in question] Now, Therefore, I, M. H. Marr of Dallas, Dallas County, Texas, for and in consideration of the sum of Nineteen Thousand, Three Hundred and Thirty-three Dollars, and Thirty-three cents, paid and advanced by D. L. Perkins (one-half) and John A. Thompson and R. A. Bristol (one-half) at my special instance and request for and on account of the consideration for the drilling of a well on the above described tract of land, receipt of which is herein and hereby acknowledged in full, have and do hereby bargain, sell, transfer, convey and set over and deliver one-half of my one-third part of all oil produced, saved and sold from said lease and all of my part of the gas, casinghead gas and gasoline, produced, saved, manufactured and sold, from the above described lease on the above described tract of fifty-two acres of land, unto the said D. L. Perkins (one-half) and John A. Thompson and R. A. Bristol (one-half) until the sum *60 of Thirty-three Thousand, Three Hundred and Thirty-three Dollars and Thirty-three cents shall have been paid and accounted one-half to said D. L. Perkins at Shreveport, Texas, and one-half to said John A. Thompson and R. A. Bristol at Ft. Worth, Texas. After payment and liquidation of said sum of $33,333.33, said interests in said lease shall revert to me, my heirs and assigns. I hereby authorize all pipe line companies or other purchases of production from said lease to pay and account directly to assignees herein respectively for said proportions of the production until said sum of $33,333.33 is paid and liquidated, commencing and effective as of date of first production. The second document, executed by all the co-owners of the lease, including petitioner M. H. Marr, and the Vaughn Drilling Co., which is known as the "Drilling Contract," provided in part as follows: 13. The consideration to be paid Contractor for the drilling, completing and equipping of the well as herein specified is the sum of $5.00 per linear foot of hole actually drilled and completed plus actual cost of the material, equipment and supplies used in and on said well, necessary for its operation and proper *61 conservation of the production therefrom, the parties hereto having estimated the total cost at $58,000.00 which said sum Owners have agreed to place in escrow in First National Bank of Dallas, Texas, together with a signed copy of this contract, with instructions to said Bank to turn over to Contractor said sum of $58.000 or so much thereof as may be necessary to cover the footage work and materials upon being furnished with evidence that said Contractor has completed this contract and presentation of invoices covering said footage and materials. In the event the well herein contracted is a gas well or a dry well, Contractor shall not bill or charge Owners for materials and equipment used or needed, but Owners shall only be required to pay for the equipment used and necessary for operation of said well if it is a gasser. It is further agreed and understood that, notwithstanding anything in this contract to the contrary, said well has been completed as a producer of oil or when said well has been completed as a gas well after being tested for oil and completed as such gas well, or when said well has been drilled to a depth of sixty-one hundred (6100) feet and has failed to produce *62 either oil or gas at same or a lesser depth. The well was completed on December 28, 1935, at a cost of between fifty and sixty thousand dollars. The respondent determined that petitioners sold an oil payment for $19,333.33 which cost them $2,156.40, thereby receiving taxable income of $17,176.93. Petitioners concede in the brief that if this amount is taxable to them, no statutory depletion is allowable on the sum. Opinion The situation here is exactly parallel to one considered in G.C.M. 22730, 1941-1 C.B., 214. One of the hypothetical situations there described is where "F. paid D. the sum of $15,000, which D. covenanted to use in developing the property, and D. agreed to pay F. the sum of $25,000, payable out of one-eighth of the oil and/or gas if, as, and only when the same is produced, saved, and marketed from the leased land." This is patently an apt description of the arrangement whereby petitioners' co-owners paid the sum of $19,333.33 which the parties covenanted would be used in developing the property, and petitioners agreed to the payment to their co-owners of the sum of $33,333.33, payable out of one-third of the oil *63 and/or gas if, as, and only when, etc. Concerning this situation the opinion proceeds (pp. 222, 224): Similarly, one who, in return for an oil payment right, furnishes money which the lease is pledged to use in developing the property would be regarded as making an investment representing an addition to the reservoir of capital investments in oil and gas in place (as distinguished from the purchase of an oil payment right from the lessee wherein there is no such pledge to invest the proceeds in development and the buyer's capital investment would replace the lessee's capital investment allocable to the interest sold). Such a transaction, involving a pledge to use the money furnished in developing the property, is distinguishable from a sale the proceeds of which are unqualifiedly received by the seller. This view seems to accord with the realities of such transactions. In none of such cases has the lessee parted with a capital asset * * *. The questions presented by the supposititious case stated herein are answered generally by the above discussion. Specifically * * * F acquired a like interest for the $15,000 furnished by him to D for development purposes. His interest would have *64 been the same had D not been pledged to expend the $15.000 for development. In that event, however, the transaction would not have been only an investment of the stated sum by F but a sale of an oil payment interest by D, and the latter would have been required to allocate thereto a part of his basis and compute gain or loss * * *. These principles have been applied where the obligation to use the proceeds for development was not express but merely implied. Rogan v. Blue Ridge Oil Company, Ltd. (C.C.A., 9th Cir.), 83 Fed. (2d) 420; United States v. Knox-Powell-Stockton Co., Inc., Ltd. (C.C.A., 9th Cir.), 83 Fed. (2d) 423; Transalifornia Oil Company, Ltd., 37 B.T.A. 119. In those situations proof was required of the sums actually expended, on the theory that any surplus would be available for the unhampered general use of the assignor. Here the proof of the amount of actual expenditures is an unsatisfactory approximation. In one of the situations considered in Rawco, Incorporated, Ltd., 37 B.T.A. 128, however, the agreement was similar to that now before *65 us. * * * the contract in each instance specifically provided that the money so paid by the G.P. Corporation to the petitioner was to be used in either drilling or completing the oil well in question * * * These contracts fixed the rights and obligations of the parties and under none of them did the petitioner have the right to convert the funds so received to its unrestricted use. Furthermore, we have no reason to assume that the contracts were not carried out and that the money was not expended by the petitioner in accordance with its obligations thereunder." (pp. 137-138.) For the reason thus suggested, we take the view that petitioners have sufficiently sustained any burden of proof imposed upon them under the present facts, and that in accordance with the principles outlined by respondent's Chief Counsel in the opinion to which we have referred, the decision must be that on this issue respondent's determination was erroneous. Decision will be entered under Rule 50.